UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FREDERICK J. CALATRELLO, Regional Director of Region 8 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, | ) ) ) ) ) | Case No.: 1:10 CV 2421 JUDGE SOLOMON OLIVER, JR. |
| Petitioner | ) ) | |
| v. | ) ) | |
| GENERAL DIE CASTERS, INC., | ) ) | |
| Respondent | ) | ORDER |

Petitioner, the Regional Director of the National Labor Relations Board ("Petitioner," "Board," or "NLRB"), filed the instant Petition for Interim Injunctive Relief, pursuant to §10(j) of the National Labor Relations Act ("NLRA") on October 22, 2010, against Respondent, General Die Casters, Inc. ("Respondent"). Petitioner is requesting: (1) a cease and desist order prohibiting Respondent from circulating and soliciting signatures for the second decertification petition; (2) an order requiring the Respondent to bargain in good faith; and (3) an order requiring an official of Respondent or a Board Agent in that official's presence to read the court's Order if it is in favor of the Board. For the reasons that follow, the Petition is hereby granted.

**I. FACTS**

Respondent manufactures aluminum die castings at two plants located in Peninsula and

Twinsburg, Ohio. On August 28, 2008, Teamsters Local 24 ("Union") was certified as the exclusive bargaining representative for a single unit of about 125 production and maintenance employees working at the two plants. In October of 2008, the parties began to bargain for their first contract. The administrative complaint against Respondent alleges Respondent has engaged in numerous unfair labor practices. This Petition though, addressed only the two most recent unfair labor practice charges filed by the Union. In December of 2009, a decertification petition was filed. However, according to the NLRB, there was no evidence that Respondent assisted in or supported that petition. That petition is currently blocked by the pending unfair labor practices charges. The 10(j) petition addresses Respondent's conduct in April and May 2010 only. Petitioner alleges that Respondent through its owner, safety coordinator, and a shift leader, solicited employee signatures for a second decertification petition. Petitioner has produced twenty affidavits in support of its claims that Respondent has engaged in unfair labor practices.

Petitioner alleges that Dan Owens ("Owens"), Safety Coordinator, regularly solicited first and second shift employees to sign the decertification petition. (Petitioner Affidavits at 3, 5, 9, 14, 16, 26, 35, 38, 61, ECF No. 13-1.) Petitioner's affidavits support the claim that he violated the NLRA by soliciting support for a decertification petition and by making coercive statements to employees. For example, two employees signed the Petition because they believed they would be discharged if they did not. (*Id*. at 6, 14.) Petitioner also alleges that sometime in April of 2010, Owens told one employee that the owner would be more willing to negotiate things such as wage increases with employees if they were not represented by the Union. (*Id*. at 14.)

Petitioner contends that Third Shift Leader John Norton ("Norton"), also a supervisor and/or agent, violated the NLRA by soliciting support for a decertification petition and making coercive

statements to employees on April 26, 2010. Norton shut down all plant operations during the third shift to hold a meeting during which he detailed all the problems the Union was causing and told employees that they had to get the Union out of the plant. (Petitioner Affidavits at 40, 44, 50, 55.) He stated that management might close or sell the plant as evidenced by supposed surveyor stakes outside the plant, that negotiations were getting nowhere, that he personally had poor experience in the past with a union, and that one of the members of the negotiating team did not care about the Union or the plant, as evidenced by the fact he was leaving in a year. (*Id*.) This employee was actually retiring in a year. (*Id.*) Most of the employees signed the decertification petition, some of whom stated that it was because they perceived Norton having threatened them with the loss of their jobs. (*Id*. at 45, 50, 55.) Norton maintains that none of the acts he allegedly performed were with permission of Respondent. However, he only received a verbal reprimand for his action. Although employees heard of this discipline, Union witnesses state that the Respondent, to their knowledge, did not disavow Norton's actions. (*Id.* at 51.)

Petitioner maintains that the owner, James Mathias ("Mathias"), unlawfully assisted the decertification effort through statements made in his negotiations update letters sent to employees. In a letter dated April 15, 2010, Mathias stated that the Respondent supported the employees who had signed the decertification petition and encouraged them in their efforts to convince undecided coworkers. (Petitioner Docs at 48, ECF No. 13-5.) The letter also stated that the Union had "failed miserably" because of its inability to get a contract after two years and the "only real option left is to throw the union out." (*Id*.) In a second letter dated May 21, 2010, Mathias referenced the circulation of the decertification petition and said that Respondent supported the decertification effort and hoped that the employees would be given a chance to vote the Union out. (*Id*. at 36.)

Petitioner alleges that Peninsula Plant Superintendent, Chuck Long ("Long"), unlawfully threatened employees with plant closure and sale of the plant while the second decertification petition was being circulated. (Petitioner Affidavits at 14, 47.) Petitioner contends that Long told an employee that Mathias was angry about having to spend a money on a lawyer and that he might close the plant. (*Id*. at 14.) Petitioner also contends that Long told an employee that he could not believe that employees did not realize Mathias was serious when he stated during the 2008 organizing campaign that he would shut down the plant before allowing the Union in. (*Id*. at 47.) Additionally, Long responded affirmatively when asked by an employee whether the surveyor stakes were present outside the plant because it was for sale. Petitioner also maintains that Long asked an employee if he had seen Mathias' April 15 negotiations update later, told the employee that Mathias was upset about the union activity, and he was unsure what Mathias was going to do. (*Id*. at 37.)

Petitioner asserts that Respondent's attorney unlawfully solicited an employee to participate in the decertification effort. Petitioner contends that Jerome Ivery ("Ivery"), an employee of Respondent, met with Respondent's attorney, Ronald Mason ("Mason"), on Monday, September 20, 2010 at Respondent's urging. (Petitioner's Mem. at 23, ECF No. 13.) Mason's colleague, Aaron Tulencik, and Human Resource Manager, Doug Hicks, were also present. (*Id*. at 23-24.) Petitioner maintains that Ivery was reluctant to meet with Mason, and prior to the meeting Ivery asked Long if he would hold it against him if he chose not to meet with Mason. (*Id.* at 24.) Long responded that though he might not, he could not say what other people would do. (*Id*.) Ivery then agreed to meet with Mason. (Petitioner Affidavits at 31.) During this meeting, Mason took a statement from Ivery. (*Id*.) Mason also brought up the decertification petition and mentioned that the Board took issue with Owens passing the petition around. Mason indicated that Respondent did not know how that

-4-

would go. (Petitioner's Mem. at 24.) Mason then stated that someone else should circulate the petition. (Petitioner Affidavits at 35.) Ivery understood Mason to be referring to him. (*Id.*)

## II. 10(j) STANDARD

Labor disputes are usually resolved under the NLRA through an administrative procedure, and when necessary, enforced by the Court of Appeals. *See Kobell v. United Paperworkers Int'l. Union*, 956 F.2d 1401, 1406 (6th Cir. 1992). However, § 10(j) of the NLRA authorizes district courts to grant temporary injunctions pending the Board's final resolution of unfair labor practices proceedings in order to preserve the status quo pending the Board's review of the practices. 29 U.S.C. §160(j). Without an injunction, a respondent could accomplish an unlawful objective before being placed under any legal restraint, rendering a final Board decision ineffective. *See Schaub v. West Michigan Plumbing & Heating, Inc.*, 250 F.3d 962, 970 (6th Cir. 2001). In carrying out their duties, district courts cannot adjudicate the merits of unfair labor practice cases. *Fleischut v. Nixon Detroit Diesel,* 859 F.2d 26, 28 (6th Cir. 1988) (citing *Levine v. C & W Mining Inc.*, 610 F.2d 432, 435 (6th Cir. 1979)). In order for the court to award injunctive relief, "[f]irst, the court must find there is 'reasonable cause' to believe that the alleged unfair labor practice has occurred. Second, if such reasonable cause is found to exist, the court must then determine whether injunctive relief is just and proper." *Calatrello v. Automatic Sprinkler Corp. Of Am.*, 55 F.3d 208, 212 (6th Cir. 1995). Unlike other circuits that have relied on the traditional test for injunctive relief in § 10(j) petitions, the Sixth Circuit "has consistently used the 'reasonable cause/just and proper' standard". *Ahearn v. Jackson Hospital Corp.*, 351 F.3d 226, 235-36 (6th Cir. 2003) (internal citations omitted).

### A. Reasonable Cause

In deciding whether to grant injunctive relief, the court must determine: (1) whether

Petitioner has shown reasonable cause to believe unfair labor practices have been committed; and (2) whether injunctive relief is "just and proper." *Frankel*, 818 F.2d at 493 (citing *C & W Mining Co.*, 610 F.2d at 435). The Petitioner has a "relatively insubstantial" burden in showing reasonable cause, "inasmuch as the proof requires only that the Board's labor practices be 'substantial and not frivolous' and that the facts of the case be consistent with the Board's legal theory." *Id.* at 237. The Regional Director does not have to prove an unfair labor practice occurred, just produce some evidence in support of the petition. *Gottfried v. Frankel*, 818 F.2d 485, 493 (6th Cir. 1987) (citing *C&W Mining Co.*, 610 F.2d at 435). The Regional Director also does not have to "convince the court of the validity of the Board's theory of liability." *Id*. (internal citations omitted). A district court "need not concern itself with resolving conflicting evidence if facts exist which could support the Board's theory of liability." *Kobell*, 965 F.2d at 1407 (quoting *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 29 (6th Cir. 1988)). Furthermore, "the district court is prohibited from assessing the merits of the underlying unfair labor case pending before the Board." *Calatrello v. Carriage Inn of Cadiz*, No. 2:06-CV-697, 2006 WL 3230778, at *3 (S.D.Ohio Nov. 6, 2006) (citing *Schaub*, 250 F.3d at 969).

### B. Just and Proper

If the district court finds that there is reasonable cause to believe that unfair labor practices have been committed, the court must then determine whether injunctive relief is "just and proper." *Frankel*, 818 F.2d at 493 (citing *C & W Mining Co.*, 610 F.2d at 435). The legal standard the court must apply is "whether such relief is 'necessary to return the parties to status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA, and whether achieving status quo is possible.'" *Kobell*, 965 F.2d at 1410 (quoting *Frankel*, 818 F.2d at 495).

The status quo "is that which existed *before* the charged unfair labor practices took place-the status quo after such practices 'is undeserving of protection.'" *Fleischut*, 859 F.2d at 30 n.3 (quoting *Gottfried v. Mayco Plastics, Inc.*, 472 F. Supp. 1161, 1166 (E.D.Mich. 1979)). The court must determine whether "it is in the public interest to grant the injunction, so as to effectuate the policies of the National Labor Relations Act or to fulfill the remedial function of the Board." *Fleischut,* 859 F.2d at 30 (internal citation omitted). "The district court, however, must be careful that the relief granted is not simply functioning as a substitute for the exercise of the Board's power." *Id*.

### III. LAW AND ANALYSIS

At the November 9, 2010 telephonic conference with counsel for the parties for the within case, the parties agreed that the court should hear the Motion for a Preliminary Injunction based on affidavits and filings. Courts have found that it is proper to make determinations for 10(j) petitions based on evidence submitted in the form of affidavits. *See e.g., Frankel*, 818 F.2d at 493-94; *Sharp v. Webco Industruies*, 225 F.3d 1130, 1134 (10th Cir. 2000); *San Francisco-Oakland Newspaper Guild v. Kennedy*, 412 F.2d 541, 546 (9th Cir. 1969); *Kennedy v. Teamsters*, *Local 542*, 443 F.2d 627, 630 (9th Cir. 1971); *Penello v. International Bro. Of Elec. Wkrs., Local 26*, 223 F.Supp. 44 (D.D.C. 1963). Additionally, nothing in § 10(j) mandates witnesses or oral testimony in these proceedings. *See Squillacote v. Automobile, Aerospace, & Agricultural Implement Workers*, 383 F.Supp. 491, 493 (D.C.Wis. 1974).

#### A. Reasonable Cause

1. 8(a)(1)

Respondent argues that there is no reasonable basis to believe that it has committed unfair labor practices based on the information put forth by Petitioner. The court does not find this

argument well-taken. Respondent includes unsigned and unauthenticated testimony it alleges is from the administrative hearing. Respondent does not include any affidavits, only the charges filed against the Union and information regarding a settlement agreement. The information that is included in the charges and settlement agreement concerns conduct during negotiations, information that goes to the merit of all the complaints by the NLRB, and not regarding the conduct at issue in the present Petition. Petitioner has alleged that the Respondent has engaged in unfair labor practices in violation of Section 8(a)(1) of the NLRA. Section 8(a)(1) forbids an employer from interfering with, restraining, or coercing employees in the exercise of their collective bargaining rights. Petitioner has met its "relatively insubstantial" burden by presenting some evidence in support of the petition and a substantial, non-frivolous theory. Petitioner has produced numerous affidavits along with other information to support its theory. The court finds the facts of the case to be consistent with Petitioner's legal theory for the reasons discussed below.

Respondent maintains that Petitioner inaccurately characterizes certain of Respondent's employees as supervisors. Respondent states that Norton and Owens are not supervisors and should not be considered supervisors for purposes of circulating a decertification petition. Petitioner asserts that Owens is a supervisor and/or agent of Respondent for the following reasons: he is repeatedly referred to in the safety handbook given to employees (Petitioner's Docs at 1-78, ECF No. 13-4); the handbook informs employees that Owens is responsible for the implementation and operation of the emergency action plan (Petitioner Docs at 32-34, 59-63, ECF No. 13-4); he is included in the management chain of command for emergency evacuations (Petitioner's Mem. at 11); he is responsible for duties included under the category of senior management, such as providing guidance for safety operations, evaluating procedures to ensure compliance, ensuring a safe working

-8-

environment, and correction of any potential safety hazard (Petitioner Docs at 26, 54, ECF No. 13-4); he trains and hands out safety manuals to employees (Petitioner Docs at 30, ECF No. 13-5); he is responsible for conducting safety audits (Petitioner's Mem. at 8); supervisors and managers are responsible for ensuring the safety of all employees, that employees are trained in safe working practices and safety regulations, and removing unsafe working conditions (Petitioner Docs at 25, 53 ECF No. 13-4); and employees/witnesses testified they consider Owens to be a member of management (Petitioner Affidavits at 2, 17, 27, 61). Petitioner asserts Norton is a supervisor and/or agent of Respondent based on the following: he is in charge of the plant one night per week (*Id.* at 3, 51); he uses independent judgment to assign employees to specific jobs for the shift based on a prioritized list of jobs given to him by management (*Id.* at 3, 41-43, 45, 51); he assigns employees who have completed their initial jobs to other duties (Petitioner's Mem. at 19); he assigns work to set-up employees and maintenance employees (*Id.*); he can pull employees off jobs and reassign them to other jobs (*Id.*); and as a part-time supervisor he spends a regular and substantial portion of his time performing supervisory functions (*Id.* at 20). As stated in *Kobell*, the court need not "resolve[] conflicting evidence if facts exist which could support the Board's theory of liability." *Kobell*, 965 F.2d at 1407. Therefore, the court does not need to determine whether the Board is correct in asserting that Norton and Owens are supervisors, as Petitioner has provided facts that support its theory of liability through descriptions of their responsibilities provided in the affidavits. Petitioner also provides support through case law for this position. Additionally, the court is prohibited from assessing the merits of the underlying case, which it would be doing were it to resolve the issue of whether or not Owens and Norton are in fact supervisors. *See Calatrello,* 2006 WL 3230778 at *3.

Additionally, Respondent disputes the characterization of Mathias's letters to the employees as unlawfully assisting in the decertification efforts through his statements. Respondent asserts that Mathias is merely asserting his First Amendment rights, and has not violated the NLRA. Again, as stated in *Kobell*, the court need not "resolve[] conflicting evidence if facts exist which could support the Board's theory of liability." *Kobell*, 965 F.2d at 1407. Petitioner states that Mathias's statements do not fall under the free speech provision under Section 8(c) of the NLRA as Respondent maintains, which allow for an employer's "expression of views without threat of reprisal or force or promise of benefit." Petitioner alleges that the statements by Mathias cross the line since they coercively encourage employees to decertify the Union. In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 619 (1969), it states that "an employer is free only to tell 'what he reasonably believes will be the likely economic consequences of unionization that are outside his control,' and not 'threats of economic reprisal to be taken solely on his own volition.'" (internal citations omitted) *Gissel* also states that

> an employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in s 7 and protected by s 8(a)(1) and the proviso to s 8(c). And any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear.

*Id.* at 617. Petitioner, therefore, has provided facts that could support its theory of liability.

Lastly, Respondent asserts that Petitioner is ignoring well-settled NLRB law by alleging Respondent's counsel, Mason, acted improperly through his meetings with Ivery. Respondent

-10-

maintains that Ivery was apprised of his *Johnnie Poultry* (146 NLRB 770 (1964)) rights.[1] Mason only wanted to meet with Ivery to prepare for trial, as Respondent contends that Ivery had indicated to several people that he had provided untruthful information in his affidavits to the Board. This information is all provided without any evidentiary support by Respondent. Petitioner has put forth affidavits in support of its claim that Respondent's counsel acted improperly. Resolving this issue would go to assessing the merits of the case, something that is prohibited by district courts. *See Calatrello,* 2006 WL 3230778 at *3. Petitioner had met its burden of providing some evidence in support of the Petition, and therefore, the first prerequisite for the issuance of an injunction pursuant to § 10(j) has been met on all of these different bases.

2. 8(a)(5)

Petitioner also alleges in its Memorandum in Support of Petition that Respondent's decertification campaign sought to obstruct the bargaining process in violation of § 8(a)(5) of the NLRA. Respondent only argues that this is not a bad faith bargaining case because Petitioner did not clearly assert this claim in the Complaint. Section 8(a)(5) makes an employer's refusal to bargain collectively with the representative of its employees an unfair labor practice. Petitioner cites to several cases where a violation of § 8(a)(5) has been found based on the employer's attempt to get the union decertified and obstruct the bargaining process. *See e.g., Wahoo Packing Co.,* 161 NLRB 174, 174 n.2, 178-79 (1966); *Rogers Mfg. Co.*, 228 NLRB 882, 886-87 (1977); *Columbia Building Materials, Inc.*, 239 NLRB 1342, 1346-47 (1979), enfd. mem. 624 F.2d 193 (9th Cir.

---

[1] In *Johnnie Poultry*, the Board set forth its policy for permitting employers to conduct employee interviews in order to obtain the facts necessary for its defense against the charges issued by the Board, which requires employers to assure employees that they are not required to speak with the employer and that there will be no retaliation either way.

1980). This court need not decide whether the NLRB can validly make a claim of a Section 8(a)(5) violation at this time. NLRB's theory just needs to be substantial, and not frivolous. *See Frankel*, 818 F.2d at 493 (internal citations omitted). Petitioner also asserts that the Complaint includes numerous allegations of bargaining violations. (Petitioner Reply at 9, ECF No. 15; *see also* Petition, ECF No. 1.) Based on the facts and case law provided, the court finds the Petitioner's theory to be substantial. Additionally, "the district court is prohibited from assessing the merits of the underlying unfair labor case pending before the Board." *Calatrello* 2006 WL 3230778 at *3.

The court is satisfied that reasonable cause exists to believe that Respondent has engaged in unfair labor practices in violation of Sections 8(a)(1) and (5) of the NLRA. Accordingly, the first prerequisite for the issuance of an injunction pursuant to § 10(j) has been met.

### B. Just and Proper

This court must now consider whether injunctive relief would be just and proper. In making this determination, the court must keep in mind that § 10(j) "was added to give the Board a means of preserving the status quo pending the completion of its regular procedure." *C & W Mining Co.*, 610 F.2d at 436. The legal standard the court must apply is "whether such relief is 'necessary to return the parties to status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA, and whether achieving status quo is possible.'" *Kobell*, 965 F.2d at 1410 (quoting *Frankel*, 818 F.2d at 495). "Interim judicial relief is warranted whenever 'the circumstances of a case create a reasonable apprehension that the efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless.'" *Sheeran v. American Commercial Lines, Inc.*, 683 F.2d 970, 979 (6th Cir. 1982) (quoting *Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir. 1967)). Petitioner argues that an injunction is just and proper in order to

> preserve the employees' free choice of the Union as their collective-
> bargaining representative, preserve the Union's ability to bargain
> effectively on behalf of the employees it represents, prevent the
> Respondent's violations from irreparably eroding employee support
> for the Union, prevent the employees from losing the benefits of
> good faith bargaining pending the Board's decision, and prevent the
> final Board order in this case from being meaningless.

(Petitioner's Mem. at 25.) Specifically, Petitioner maintains that as a result of the unfair labor practices engaged in by Respondent in circulating the second decertification petition, there has been a significant drop off of employee support for the Union. (Petitioner's Mem. at 28.) Additionally, Petitioner contends that Respondent's actions have served to undermine the Union's status as the bargaining representative, as it works to secure its first collective bargaining agreement. (*Id*.) Employee observers no longer even attend negotiation meetings. (*Id*.) Petitioner asserts that the need for an injunction is especially great in this case because the Union is newly certified and has yet to sign an initial collective bargaining agreement. (*Id*. at 26.) Courts have found employees to be "highly susceptible" to unfair labor practices under such circumstances. *See Ahearn*, 351 F. 3d at 239 (quoting *Arlook v. S. Lichtenberg & Co., Inc.*, 952 F.2d 367, 373 (11th Cir. 1992)).

The status quo in the relationship between Respondent and the Union before the alleged unfair labor practices of Respondent was a workplace free of coercion and fear. Respondent contends that Petitioner is requesting a return to the status quo of a time when employee support was so great that many people regularly wore Union paraphernalia and attended Union meetings. Respondent asserts that the employees are merely exercising their Section 7 rights under the NLRA to refrain from joining the Union. However, Petitioner is not seeking an order requiring the wearing of Union paraphernalia or the attending of meetings. Petitioner seeks an order where employees can freely exercise their Section 7 rights, whether that is wearing Union paraphernalia or circulating

a petition to decertify the Union. The Petitioner is not looking for the Respondent to restore support for the Union, it simply wants to "dispel the coercive atmosphere [Respondent] created through its unlawful actions that drove employees away from the Union." (Petitioner Reply at 8.) This is especially necessary given that employees have provided statements that they stopped showing support for the Union out of fear of retaliation or job loss. (*Id*.; Petitioner Affidavits at 14.) For example, Charles "Chuck" Smith stated in his affidavit that though he supported the Union, he was afraid he might lose his job if he did not sign the Petition since he had been talked to by Long and Owens about getting rid of the Union, and was asked several times by Owens to sign the decertification petition. (Petitioner Affidavit at 14.) Long told Chuck that Mathias was mad about having to spend money on a lawyer and that he may shut the plant down. (*Id*.) Owens told Chuck that Mathias would be more willing to negotiate things like raises if the Union was not there. (*Id*.) The court concludes, based on the evidence offered by Petitioner, that a cease and desist order prohibiting Respondent from circulating and soliciting signatures for the second decertification is necessary to return the parties to status quo pending the Board's final resolution of the claims. The court finds that the evidence put forth by the Petitioner on this issue, as well as for establishing "reasonable cause," demonstrates that the erosion of Union support has occurred and may continue to occur, and issuing injunctive relief in the form of a cease and desist order is just and proper.

Petitioner next requests an interim order requiring the Respondent to bargain in good faith. As stated above, Respondent's only argument in regard to this claim is that this has not been asserted in the Complaint, and therefore Petitioner cannot request an interim order requiring it to bargain in good faith. Petitioner has presented enough evidence to meet its relatively "insubstantial" burden in demonstrating reasonable cause exists for the court to issue injunctive relief through an interim

order requiring the Respondent to bargain in good faith. In addition, Petitioner also asserts that the Complaint includes numerous allegations of bargaining violations. (Petitioner Reply at 9; *see also* Petition, ECF No. 1.) The court finds that a bargaining order is just and proper.

Lastly, Petitioner requests an interim order requiring an official of Respondent or a Board Agent in the official's presence, to read any order of this court in favor of the Board, to assembled employees. Petitioner asserts this is just and proper to restore employee support for the Union and ensure the collective bargaining process is not undermined. Respondent argues that any reading of a court order is inappropriate, as the Petitioner's allegations of bad faith are unsupported; there is less evidence of alleged behavior than in other cases that required readings; and it would be far more prejudicial to have the order read, than to post it as is done in most NLRB remedial cases. Respondent maintains that a posting of the order is more than adequate in the instant case, especially when considering that the Union was previously found guilty of illegal conduct during the collective bargaining agreement negotiation. The violations concerning the Union's conduct previously addressed by the Board, though, are not part of the claims against Respondent asserted here regarding the employees' rights. The court recognizes that the cases cited by the Petitioner do in fact contain alleged conduct more egregious than that alleged by Petitioner here, such as refusing to recognize the Union, insisting on contract provisions that exclude the Union from any effective means of participation, terminating employees to discourage Union activity, and making changes to the terms and conditions of employment. *See Norelli v. HTH Corp.*, 699 F. Supp. 2d 1176, 1206-07 (D.Haw. 2010) (employer refused to recognize union, insisted on a recognition clause that allowed employer the exclusive right to change all terms of employment unilaterally and arbitrarily, transferred management duties of hotel to a related company that fired all of the employees and only

rehired some employees, but did not hire the union's bargaining committee personnel); *Garcia v. Sacramento Coca-Cola Bottling Co., Inc*., No. 2:10-cv-2176, 2010 WL 3294384, at *14 (E.D. Cal. August 20, 2010) (when an employee union merged with another union, employer refused to recognize representative of merged union, and helped employees collect signatures for a decertification petition). As was true of those cases, the court finds that employees here will be thwarted in their efforts to support the Union, if such action as the reading of the court's Order is not taken. The Petitioner has alleged upper level management, as well as counsel for the Respondent, have been involved in the circulation of the decertification petition. For this type of conduct to be perpetuated by people in such positions sends an especially strong message to employees regarding their ability to support the Union and the potential for job loss. In light of the positions held by the people alleged by Petitioner to have engaged in these unfair labor practices, more than a customary posting of the court's Order is required in this case in order for the parties to be returned to the status quo. In addition, since the Union is newly certified and has yet to sign an initial collective bargaining agreement, and employees are "highly susceptible" to unfair labor practices, it is especially important that employees are fully apprised of their rights and the conduct expected of Respondent. *See Ahearn*, 351 F. 3d at 239 (internal citation omitted). The legal standard the court must apply is "whether such relief is 'necessary to return the parties to status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA...'" *Kobell*, 965 F.2d at 1410 (quoting *Frankel*, 818 F.2d at 495). In order to return the parties to the status quo pending the Board's proceedings, a reading of the order is necessary. A simple posting, as Respondent suggests, does little to demonstrate to employees that they can actually "show their support for the Union without fearing retaliation, coercion, or loss of jobs." (Petitioner Reply at 9.)

As Respondent stated, employees are free to choose whether or not to exercise their Section 7 rights, but need to be given an environment in which they are truly free to do so. Therefore, the court finds an interim Order requiring a Respondent official or a Board Agent in that official's presence to read this court's Order to assembled employees is just and proper to restore employee support for the Union and ensure that the parties' collective bargaining process is not undermined.

## IV. CONCLUSION

For the foregoing reasons, the court grants the Board's Petition for 10(j) Relief in its entirety (ECF No. 1). Petitioner's Motion to Strike Respondent's Sur-Reply is denied (ECF No. 17). This court finds there is reasonable cause to believe unfair labor practices have been committed and that the requested injunctive relief by Petitioner is just and proper. The court hereby orders that pending the final disposition of the matters involved herein, which are currently before the Board, Respondent, its officers, agents, representatives, servants, employees, attorneys, and all persons acting in concert or participation with them, be and they hereby are, enjoined and restrained from:

(a) Threatening employees with the closure or sale of the Respondent's plants and with unspecified reprisals in order to coerce employees into signing a decertification petition;

(b) Coercively informing employees that the Respondent would be more willing to negotiate with employees if they did not have Union representation, in order to undermine employee support for the Union;

(c) Circulating a decertification petition and/or soliciting employees to sign it;

(d) Distributing materials to employees which encourage them to decertify the Union;

(e) Coercively seeking to induce employees to assist in circulating a decertification petition;

(f) Refusing to bargain in good faith with the Union as the exclusive bargaining

representative of Respondent's employees in the Unit, with respect to rates of pay, hours of employment, and other terms and conditions of employment; and

(g) In any like or related manner interfering with, restraining, or coercing employees in the exercise of rights guaranteed them by Section 7 of the Act.

It is further ordered that pending the final disposition of the matters involved herein, now pending before the Board, Respondent, its officers, agents, representatives, servants, employees, attorneys, and all persons acting in concert or participation with them, shall take the following affirmative steps:

(a) Within ten days of this Court's Order, hold a meeting or meetings at Respondent's Peninsula, Ohio and Twinsburg, Ohio plants, scheduled to ensure the widest possible attendance, at which this Court's Order is to be read to the employees by a responsible management official or, at the Respondent's option, by a Board Agent in that official's presence;

(b) Upon request, bargain collectively and in good faith with the Union as the exclusive bargaining representative of the unit employees concerning terms and conditions of employment and, if an understanding is reached, embody it in a written, signed agreement;

(c) Post copies of the District Court's Order at its Peninsula, Ohio and Twinsburg, Ohio plants in all places where notices to its employees are normally posted; maintain these postings during the Board's administrative proceeding free from all obstructions and defacements; grant all employees free and unrestricted access to said postings; grant to agents of the Board reasonable access to said postings; and grant to agents of the Board reasonable access to its facilities to monitor compliance with this posting requirement; and

(d) Within 20 days of the issuance of the District Court's Decision and Order, file with the

District Court and serve upon the Regional Director of Region 8 of the Board, a sworn affidavit from a responsible official describing with specificity the manner in which Respondent has complied with the terms of the Court's Order, including the location of the posted documents.

This case is hereby hereby closed, but the court has continuing jurisdiction regarding the enforcement of this Order.

IT IS SO ORDERED.

/S/ SOLOMON OLIVER, JR.
CHIEF JUDGE
UNITED STATES DISTRICT COURT

January 11, 2011